Filed 9/25/20  P. v. Palomino CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

4TH APPELLATE DISTRICT

DIVISION 3

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>OSVALDO PALOMINO,<br><br>    Defendant and Appellant. | G057727<br><br>(Super. Ct. No. 16NF2375)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Denise de Bellefeuille (Retired judge of the Santa Barbara Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.) and Patrick Donahue, Judge.  Affirmed in part, conditionally reversed in part and remanded with directions.

Jennifer A. Gambale, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Roberta L. Davis and Gary A. Lieberman, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Osvaldo Palomino was charged with assault with a firearm on A.M. (Pen. Code, § 245, subd. (a)(2); count 1);[1] residential burglary (§§ 459, 460, subd, (a); count 2); assault with a deadly weapon on A.M. (§ 245, subd. (a)(1); count 3); assault with force likely to cause great bodily injury on A.M. (§ 245, subd. (a)(4); count 4); kidnapping H.M. during a carjacking (§ 209.5, subd. (a); count 5); carjacking (§ 215, subd. (a); count 6); assault with semiautomatic firearm on H.M. (§ 245, subd. (b); count 7); assault with a semiautomatic firearm on a police officer (§ 245, subd., (d)(2); count 8); and active participation in a criminal street gang (§ 186.22, subd. (a); count 9).[2]

Regarding the burglary count, the information alleged a nonaccomplice was present in the residence at the time of the burglary (§ 667.5, subd. (c)(21). It further alleged counts 1 through 8 were committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)); Palomino personally used a firearm in committing the offenses charged in counts 1, 7 and 8 (§ 12022.5, subd. (a)); he personally used a firearm in committing the offenses charged in counts 5 and 6 (§ 12022.53, subd. (b)); and that he suffered a prior strike conviction (§§ 667, subds. (d), (e)(1), 1170.12, subds. (b), (c)(1)).

The jury found Palomino guilty of simple assault (§ 240) as a lesser included offense of count 1, guilty on counts 3, 4, 5, 7, 8, and 9; and found true the gang enhancement as to counts 3, 4, 5, 7, and 8, and the firearm use allegations true on counts 5, 7, and 8. Palomino was acquitted of the charges in counts 2 and 6. He waived jury trial on his prior strike allegation and the court found that allegation true.

The court imposed an indeterminate term of 24 years to life and a concurrent determinate term of 28 years in prison; and 180 days in county jail on the misdemeanor lesser included offense of count 1 but deemed that sentenced served.

---

[1] All undesignated statutory references are to the Penal Code.

[2] The original information also charged Julie Borboa and Frank Velasquez along with Palomino.

2

On appeal, Palomino contends the evidence is insufficient to support the verdict on count 3 or the true finding on the gang enhancement on count 8, assaulting a police officer with a semiautomatic firearm. We disagree.

Palomino also contends the trial court erred in ruling on his pretrial motion under *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*).) Again, we agree. The trial court abused its discretion in denying him discovery of *Pitchess* material about a complaint alleging one of the investigating officers planted evidence and filed a false police report, and a separate complaint about filing a false police report. So, the convictions on the remaining counts (5, 7, 8 & 9), the true findings on the gang enhancements, and true findings on the firearm enhancements are conditionally reversed and the matter is remanded with directions for further proceedings.

On remand, Palomino is entitled to the *Pitchess* material which should have been disclosed to him. The trial court shall grant Palomino sufficient time to investigate the disclosed information and thereafter file a motion for a new trial. If Palomino fails to file a motion for a new trial or if the court denies the motion, the court shall reinstate the conditionally reversed convictions and true findings.

## FACTS[3]

*Counts 1 Through 4*

On August 23, 2016, A.M., his girlfriend J.W., J.Z., her older boyfriend Miguel, and M.Z., J.Z.'s cousin, all lived in an apartment in the Glen Neighbors (Neighbors) area of Anaheim. That afternoon, J.Z. and Miguel took M.Z.'s baby and headed to the park. They did not get that far and were confronted by J.Z.'s father. J.Z.'s father was upset with her and Miguel because Miguel is 14 years older than J.Z., who was 18 years old at the time and pregnant.

---

[3] We present the facts from the trial in the light most favorable to the judgment in accord with established principles of appellate review. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.).

3

J.Z. telephoned J.W. back at the apartment. J.W., A.M., and M.Z. went looking for J.Z. and Miguel, and found them at the end of the alley. A.M. said J.Z. and Miguel were being threatened. The group headed back toward the apartment as they walked through the alley. Behind them was J.Z.'s father, who started whistling, calling forth or signaling others. Three males and a female then arrived. Palomino, who J.Z. knew as "Felon," was one of the males.

Palomino said, "Folks gang." Because he thought Palomino was looking at him "wrong," A.M. asked what he was looking at. Palomino then swung at A.M. and punched him on the left side of his face. A.M. said he saw the black handle of a gun in Palomino's hand. According to A.M., Palomino pointed a revolver at him and lifted his shirt to reveal a second firearm, a semiautomatic.[4] A.M. was not afraid of being shot. He said he could see in Palomino's eyes that Palomino was not going to shoot. J.Z. saw only one gun. It was tucked into Palomino's waistband.

A.M. said he and Palomino cursed at each other, Palomino asked where A.M. was from and said, "This is Folks neighborhood." During the scuffle, the female with Palomino, later identified as Julie Borboa, struck A.M. in the left arm with a metal bat that had spikes on the end. The spikes did not make contact when she hit A.M.

A.M. and his group made it back to their apartment, but Palomino, Borboa, and a male A.M. knew only as "Blind Guy" broke into the patio of the apartment where the fight continued for about a minute. Blind Guy was later identified as Frank Velasquez. Eventually, A.M. made it to the inside of the apartment. Shortly thereafter, came a knock at the door. Someone said the male at the door wanted to talk with A.M. Thinking there was a truce, A.M. went to the door. When he got there, "they" grabbed him and pulled him out of the apartment.

---

[4] A video of the incident was played for the jury. Apparently, the video did not show Palomino pointing a gun at A.M., but A.M. remained positive Palomino pointed a firearm at him.

Another struggle ensued on the patio, where Palomino and Velasquez fought A.M. Velasquez was behind A.M. and Palomino was in front of him. Palomino punched A.M. with both hands, landing punches to A.M.'s stomach area and face. A.M. felt blows from behind and a hard object hit him on the back of his head. J.W. and J.Z. saw Velasquez with what appeared to be a large kitchen knife. Borboa attempted to hit A.M. with "the stick with stuff on it." A.M. did not see a gun or a knife during this struggle, but he suffered a small hole in the back of his shirt and believes he was stabbed with something. The only other injuries A.M. suffered were small bumps on his head.

*Counts 5 Through 9*

Later that evening, between 9:00 and 10:00 p.m., Velasquez called H.M. and asked for a ride to Walmart. H.M. drove his two-door Civic and picked up Velasquez and a "young man" he had seen before but did not know,[5] in the alley between Neighbors and Glen Avenue. Velasquez got into the back seat and Palomino sat in the front passenger seat. H.M. drove down the alley to La Palma Avenue, where he saw two patrol cars. Palomino got nervous and said, "Police. Police."

While they continued on La Palma Avenue toward Euclid Avenue, a police car pulled in behind H.M.'s vehicle and turned on its emergency lights. Palomino nervously told H.M. not to stop, to turn around, and to get as close as he can to Neighbors. When H.M. slowed down, Palomino told him to speed up. Palomino took out a gun and said, "Go, go, go." After hearing Palomino rack the pistol, Velasquez told Palomino to "be careful with the Paisan (H.M.)." H.M. was afraid Palomino would shoot him.

Slowly, H.M. drove as close as he could to Neighbors, but there were "a lot of police there," and two of the patrol vehicles hit H.M.'s car. H.M. stopped his car and Palomino got out and ran. H.M. and Velasquez remained in the car.

_____

[5] The young man was later identified as Palomino.

Anaheim Police Department Investigator Jacob Slechta was part of the surveillance team set up earlier that evening in Neighbors, an area claimed by the Latin Kings street gang (Folks). Anaheim's helicopter (Angel) was also involved in the surveillance. The police were looking for Palomino and Velasquez. Slechta was in one of the vehicles and gave chase when Palomino got out of the car and ran. Slechta could see something in Palomino's hand, but could not tell what it was. Another officer, Smith, was in front of Slechta during the chase. Slechta lost sight of Palomino when Palomino turned into a breezeway, but he saw Smith fire his service weapon multiple times.

Smith, who was in a police uniform, was also part of the surveillance team looking for Palomino and Velasquez. It was Smith's vehicle that was immediately behind H.M.'s car as they approached La Palma and Euclid Avenues. Smith turned on his lights and siren to initiate a stop. H.M.'s vehicle did not stop; it continued at a slower speed. Smith hit H.M.'s vehicle's left rear quarter panel with the squad car's right bumper and it stopped. Palomino, the right front passenger got out and ran. Smith gave chase. He kept gaining on Palomino and shouted for Palomino to stop, drop what was in his hand, and get on the ground. Smith could see something dark in Palomino's right hand, but could not see what it was. Palomino kept running.

Palomino, with his hand in his waistband, went around a corner that led to Neighbors. He turned, made eye contact with Smith, and raised a chrome barreled gun. The video from Smith's body camera showed Palomino raising a gun. Smith instinctively fired at Palomino. He said he fired at least 2 shots. Palomino did not fire his weapon. Palomino was struck by a bullet. He was taken into custody after having been treated by paramedics.

Approximately two-thirds of the way down the alley into which Palomino ran and was wounded, the police found a loaded semiautomatic Raven Arms MP-25 handgun. The firearm was consistent with the one Smith said he saw in Palomino's hand. A cell phone found in the alley contained a photograph of Palomino.

6

*Gang Evidence*

Palomino had a number of tattoos, including "Neighbors" on his upper left forearm; and "Anaheim," "OC," and the Atlanta Falcons logo on his right abdomen. Tattooed on top of his head is the letter "F" and "Folks" is tattooed above his hairline.

The parties stipulated that: Family of Latin Kings (Folks) was a criminal street gang on August 23, 2016; Folks had a common name or identifying signs or symbols, including "Folks, AFG, 167, Neighbors, AFGX3, Folks X3, and AF"; the gang's primary activities include assault with a deadly weapon, felony vandalism, and unlawful possession of firearms; Folks gang members have engaged in a pattern of criminal gang activity after September 26, 1988, and two of the gang crimes occurred within three years of each other; and on August 23, 2016, Folks claimed two territories in Anaheim, one of which is the area where the charged offenses occurred. The police department's last known address for Palomino is in the second area claimed by the gang.

Kevin Avila, a gang investigator for Anaheim Police Department testified as a gang expert. Avila said respect is important to gangs. Gang members earn respect by committing crimes. A gang member with a gun garners more respect than one who does not have one. The more violent the act, the more respect is garnered. Gang-related tattoos are earned and considered a badge of honor. Tattoos on the head, neck or face, i.e., places not easily concealable, show the person constantly represents the gang.

Avila stated gangs use guns for offensive and defensive purposes. Members are expected to defend their territory and they use guns to do so. As acquiring firearms is hard for gang members, when they have one "they do whatever it takes to hold on to them."

Avila said a "hit-up" occurs when one gang member asks someone he believes to be a gang member "where they are from." The result of a hit-up is usually a physical alteration. If a gang member is hit-up, he or she is expected to state their gang's name. Failure to do so shows weakness.

7

The prosecutor gave Avila a hypothetical set of facts tracking the evidence in this case, including the fact that in the Neighbors alley where Palomino hit-up A.M.; Palomino assaulted him immediately after the hit-up, and followed him to the apartment and pulled him out of the apartment to assault him some more; and then later that night, two gang members (Palomino & Velasquez) are in a car when Palomino pulls a gun on the driver of the vehicle and tells him to keep driving when police are spotted and orders the driver to drive to the gang's territory. The facts included Palomino's tattoos and that Palomino pulled a firearm on a police officer who chased him. Based on the facts in the hypothetical, Avila opined Palomino was an active gang participant. He further opined all the remaining charges were committed for the benefit of a criminal street gang. In so testifying, Avila relied on the fact that the crimes occurred in the gang's territory and were likely to cause fear in residents of the area.

Avila conceded that just because a gang member flees from the police does not necessarily make the flight gang related. In other words, not every crime committed by a gang member is gang related.

*Defense Case*

M.Z. testified she lived in an apartment in the Neighbors area in August 2016. On the afternoon of August 23, 2016, as the group (M.Z., J.W., A.M., J.Z., & Miguel) were walking in the alley back toward their apartment, J.Z.'s father whistled and M.Z. believed it was a call for gang members to attack J.Z.'s boyfriend Miguel. She said J.Z.'s father likes to cause problems. She heard him say, "Get 'em." M.Z. believes J.Z.'s father wanted Miguel to get beat, not A.M.

Prior to the altercation, however, A.M. looked at Palomino, who M.Z. has heard being called "Felon," and said something to him. Palomino answered, "What" and "went towards" A.M. M.Z. did not hear anyone other than J.Z.'s father say "Folks."

M.Z. did not see a gun or a knife that day, but when the fight continued on her patio, she heard someone scream, "he has a knife," and saw something in Velasquez's

8

hand that could have been a knife. After the fight, she J.Z. and Miguel went in the bathroom, and began cutting themselves. J.Z. then called the police, claiming her boyfriend was being killed. M.Z. heard J.W. tell J.Z. to embellish her story when she talks to the police.

M.Z. said Borboa and Velasquez are Folks gang members. She said H.M. is a drug addict who smokes methamphetamine.

The parties stipulated the recovered firearm was swabbed for DNA and compared to DNA obtained from Palomino. Due to the mixture of the small amount of DNA on the weapon, it was not suitable for comparison. Lastly, the jury saw where on Palomino's body a bullet fired by Smith entered and where the bullet was removed.

## DISCUSSION

1. *Insufficient Evidence Claims*

Palomino contends the evidence is insufficient to support the guilty verdict on count 3 (assault with a deadly weapon on A.M.) or the true finding on the gang enhancement on count 8 (assault with semiautomatic on a police officer). We disagree.

"In addressing a challenge to the sufficiency of the evidence supporting a conviction, the reviewing court must examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence— evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.]" (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) We "presume[] in support of the judgment the existence of every fact the trier of fact could reasonably deduce from the evidence. [Citations.]" (*Ibid.*) "'"If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment. [Citation.]"' [Citation.]" (*Id.* at p. 1054.) We may reverse only if under no hypothesis whatever is there substantial evidence. (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

9

*A. Count 3*

Count 3 of the information charged Palomino with assault with a deadly weapon (§ 245, subd. (a)(1)) on A.M. The information alleged the weapon used was a knife. It appears this charge was based on the second assault on A.M., the one inside the patio at the apartment. It was after that incident that A.M. discovered a small whole in the back of his shirt and believed he was stabbed. According to A.M., during this encounter Palomino was in front of him, punching with both hands. Velasquez was behind A.M. A.M. felt blows from behind and from an object. A hard object hit him in the back of the head. During the fight, someone saw a knife and screamed "he has a knife." M.Z., a defense witness, testified to seeing something in Velasquez's hand that could have been a knife.

Palomino was prosecuted on count 3 on an aiding and abetting theory, that Velasquez stabbed A.M. during this fight and Palomino aided and abetted the stabbing. 1 who aids and abets a principal's commission of a crime shares the guilt of the actual perpetrator. (§ 31.) "[A]n aider and abettor is a person who, 'acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime.' [Citation.]" (*People v. Prettyman* (1996) 14 Cal.4th 248, 259.)

Given that Palomino assaulted A.M. minutes earlier in the alley and followed A.M. and his roommates back to their apartment where Palomino and Velasquez pulled A.M. out of his apartment and started hitting him on the patio, it is reasonable to infer Palomino wanted Velasquez to take part in the beating. Palomino contends there is no evidence he knew "Velasquez planned to assault [A.M.] with a knife or that he specifically intended to help Velasquez commit that assault with a knife." Such knowledge is not required.

10

"'A person who knowingly aids and abets criminal conduct is guilty of not only the intended crime [target offense] but also of any other crime the perpetrator actually commits [nontarget offense] that is a natural and probable consequence of the intended crime. The latter question is not whether the aider and abettor *actually* foresaw the additional crime, but whether, judged objectively, it was *reasonably* foreseeable. [Citation.]' [Citation.] Liability under the natural and probable consequences doctrine 'is measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted.' [Citation.]" (*People v. Medina* (2009) 46 Cal.4th 913, 920.) "A reasonably foreseeable consequence is to be evaluated under all the circumstances of the individual case [citation] and is a factual issue to be resolved by the jury. [Citations.]" (*Ibid.*) In other words, "[a]ider and abettor liability under the natural and probable consequences doctrine does not require assistance with or actual knowledge and intent relating to the nontarget offense, nor subjective foreseeability of either that offense or the perpetrator's state of mind in committing it. [Citation.]" (*People v. Chiu* (2014) 59 Cal.4th 155, 165-166.)

In gang settings, cases finding culpability based on a natural and probable consequences theory where the defendant purportedly did not *know* the perpetrator would elevate the seriousness of the attack by introducing a weapon into the fray are not rare. (See, e.g., *People v. Medina, supra*, 46 Cal.4th at pp. 920-921, and cases cited therein.) Here, just minutes before the fight inside the patio, Palomino and a fellow gang member, Borboa, assaulted A.M. Palomino was armed with a gun and Borboa used a spiked bat. Minutes later another gang member joined Palomino in pulling A.M. out of his apartment and assaulted him with a weapon, as Borboa had just done in the alley and on the patio. Palomino could hardly have been surprised. An assault by Velasquez with a weapon was reasonably foreseeable and, as a result, sufficient evidence supports Palomino's conviction on count 3 based on his aiding and abetting Velasquez's assault on A.M.

11

### B. *The Gang Enhancement Attached to Count 8*

The jury found Palomino's assault with a semiautomatic firearm on Smith was "committed . . . for the benefit of, at the direction of, or in association with Folks, a criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members of that gang." (§ 186.22, subd. (b)(1).) "The enhancement . . . requires proof that the defendant commit a gang-related crime in the first prong—i.e., that the defendant be convicted of a felony committed for the benefit of, at the direction of, or in association with a criminal street gang. [Citation.] There is no further requirement that the defendant act with the specific intent to promote, further, or assist a *gang*; the statute requires only the specific intent to promote, further, or assist criminal conduct by *gang members*." (*People v. Albillar* (2010) 51 Cal.4th 47, 67.)[6] "To prevail under the substantial evidence standard, defendants must demonstrate that no reasonable fact finder could have found true the alleged gang enhancement." (*People v. Garcia* (2016) 244 Cal.App.4th 1349, 1368.)

Palomino argues the only evidence supporting the gang enhancement is the gang expert's testimony and that expert testimony alone cannot support the true finding, citing *People v. Ochoa* (2009) 179 Cal.App.4th 650, 657 ("[a] gang expert's testimony alone is insufficient to find an offense gang related"). He is wrong.

In *In re Frank S.* (2006) 141 Cal.App.4th 1192, a minor was detained by a police officer for failing to stop for a red light while riding a bicycle. A subsequent search of the minor turned up a knife, methamphetamine, and a red bandana. The minor, who had several friends in northern gangs, said he needed the knife for protection because he had been attacked two days earlier by southern gang members. (*Id.* at p.

---

[6] The prosecution must also prove the street gang has engaged in a "'pattern of criminal gang activity.'" (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1044.) That element was established by the stipulation between the parties.

12

1195.)  In addition to other charges, the minor was accused of possessing a concealed dirk or dagger with a section 186.22, subdivision (b)(1) gang enhancement.  (*Ibid*.)

When the minor entered the juvenile detention facility, he identified himself as an affiliate of the Nortenos gang.  (*In re Frank S., supra*, 141 Cal.App.4th at p. 1195.)  A gang expert testified at the minor's jurisdictional hearing that the minor's admission of gang affiliation, his possession of the knife and a red bandana, and his stated need to protect himself from southern gang members led her to believe he was an active participant in the Northside Visalia gang.  (*Ibid*.)  She also opined the knife benefits Nortenos by providing protection from rival gangs.  (*Id*. at pp. 1195-1196.)  The juvenile court found all counts true.  (*Id*. at p. 1196.)

The appellate court found the gang enhancement was not supported by substantial evidence.  (*In re Frank S*., *supra*, 141 Cal.App.4th at p. 1196.)  It reviewed previous opinions involving the propriety of expert testimony (*id*. at pp. 1196-1198; see *People v. Gardeley* (1996) 14 Cal.4th 605, 618 [expert opinion based on a hypothetical rooted in the facts of the case]; *People v. Killebrew* (2002) 103 Cal.App.4th 644, 657-658 [expert may testify to the culture and habits of gangs, but cannot testify that a specific individual possessed a specific intent]) and concluded the expert testified to the minor's specific intent, but whether the minor had the requisite specific intent was an issue for the court, not an expert.  (*In re Frank S.,* at p. 1199.)  What the record lacked was any evidence to support the expert's opinion.  "The prosecution did not present any evidence that the minor was in gang territory, had gang members with him, or had any reason to expect to use the knife in a gang-related offense.  In fact, the only other evidence was the minor's statement to the arresting officer that he had been jumped two days prior and needed the knife for protection.  To allow the expert to state the minor's specific intent for the knife without any other substantial evidence opens the door for prosecutors to enhance many felonies as gang-related and extends the purpose of the statute beyond what the Legislature intended."  (*Ibid.*)

13

Moreover, gang membership does not prove the specific intent required under subdivision (b)(1) of section 186.22. (*In re Frank S., supra*, 141 Cal.App.4th at p. 1199.) To sustain the gang enhancement, there must be evidence the crime had some connection with the activities of a criminal street gang. (*Ibid*.) "A gang expert's testimony al1 is insufficient to find an offense gang related. [Citation.] '[T]he record must provide some evidentiary support, other than merely the defendant's record of prior offenses and past gang activities or personal affiliations, for a finding that the *crime* was committed for the benefit of, at the direction of, or in association with a criminal street gang.' [Citation.]" (*People v. Ochoa, supra*, 179 Cal.App.4th at p. 657.)

The Attorney General counters Palomino's argument, relying on our Supreme Court's decision in *People v. Vang* (2011) 52 Cal.4th 1038. "'Expert opinion that particular criminal conduct benefited a gang' is not only permissible but can be sufficient to support the . . . section 186.22, subdivision (b)(1), gang enhancement. [Citation.]" (*Id*. at p. 1048.) The issue in *Vang* was not whether the evidence was sufficient to support a true finding on the alleged gang enhancement, but rather, whether an expert is entitled to answer a hypothetical question closely tracking the evidence admitted at trial. (*Id*. at pp. 1041, 1044.)

Here, there was evidence other than the gang expert's opinion to support the true finding on the gang enhancement. On the day of the charged offenses, Palomino was in possession of at least one firearm, attacked A.M. twice in a very short period of time and, at least in the first attack, invoked his gang's name. That evening when the police attempted to stop the vehicle in which Palomino was a passenger, he pulled a gun on the driver and told him to drive back to the territory claimed by Palomino's gang. When the driver was not able to do so, Palomino attempted to run from the police to the gang's turf. He did not get that far because an officer shot him when, during the flight, he turned and pointed a gun at the officer.

14

It was evident Palomino attempted to flee back to the gang's territory. The gang expert testified to the importance of guns to gangs and that guns are hard to come by for gang members. When he was then asked about a gang member's attempt to return to the gang's turf he ventured that "[gang members] would like to go back to their gang territory because that's their home turf. They will be able to hide a little easier. They can stash a firearm. [¶] So that would explain why a gang member would want to go back to a neighborhood. Because . . . he is going to be safer there and because he has a firearm. He does not want to lose a firearm because they are very important to the gang." Thus, a jury could find the need to get back to Folks territory in order to save the gun from falling into the hands of the police was done specifically to benefit the gang. Accordingly, we conclude sufficient evidence supports the true finding on the gang enhancement attached to count 8.

2. Pitchess *Motion*

      *A. Procedural Background*

Prior to trial, Palomino brought a *Pitchess* motion seeking to discover information contained in Smith's personnel files at the Anaheim Police Department. (*Pitchess, supra*, 11 Cal.3d 531; Evid. Code, § 1043 et seq.) He sought "[a]ny reports, documents, or other evidence of complaints of: excessive force, aggressive conduct, unnecessary violence, unnecessary force, unnecessary use of a firearm, racist remarks, false arrest, false statements in reports, false claims of probable cause, false claims of disability, false time cards, any conduct arguably evidencing moral turpitude, or any other evidence of or complaints of dishonesty." Judge David A. Hoffer found the declaration in support of the motion insufficient, and denied it without prejudice.

Thereafter, Palomino filed a second *Pitchess* motion with a new declaration. Judge Denise de Bellefeuille, sitting by assignment, found the new declaration made the threshold showing necessary to compel review of Smith's personnel files in camera. The custodian of records brought to court files containing complaints

15

"relative to the motion." After reviewing these files in camera, Judge De Bellefeuille concluded they did not contain any discoverable information.

On appeal, Palomino filed a request to augment the appellate record with the files reviewed by Judge de Bellefeuille during the in camera portion of the *Pitchess* motion. We granted that request and ordered the documents to be transferred from the trial court to this court within 20 days. Alternatively, if the trial court did not retain a copy of the files reviewed by Judge de Bellefeuille, we ordered the trial court to conduct a new hearing with the same files previously reviewed and to submit to this court a copy of the files reviewed.

In response to our order, Judge Craig Robison conducted another in camera hearing on the *Pitchess* motion originally heard by Judge de Bellefeuille (who was unavailable.) The deputy city attorney and the custodian of records from the first in camera hearing were not present at the second in camera hearing. The deputy city attorney present at the second in camera hearing stated he spoke with the deputy city attorney and the custodian of records who had been at the first in camera hearing and neither had any "recollection of the specific documents that were reviewed."

In the second in camera hearing, Judge Robison noted a complaint by an individual alleging Smith and two other officers planted evidence on him and filed a false police report, and another complaint by another individual alleging Smith filed a false police report. Judge Robison ordered disclosure of those complaints, but noted it was unknown whether the files he reviewed were the same as those reviewed by Judge de Bellefeuille in the first in camera hearing. We note, however, that in the first in camera hearing, the custodian of records stated he uncovered two complaints in the preceding five years. (See Evid. Code, § 1045, subd. (b)(1) [complaints older than five years not to be disclosed].)

16

*B. Analysis*

Generally, we review an order denying a *Pitchess* motion for an abuse of discretion. (*People v. Mooc* (2001) 26 Cal.4th 1216, 1228.) "In *Mooc*, the Supreme Court held that in order to preserve the defendant's ability to obtain appellate review of the denial of a *Pitchess* motion, the trial court should make a record of the documents it reviewed in camera, either by photocopying the documents, preparing a written list of the documents it reviewed and/or stating on the record the documents it reviewed. [Citation.] Discoverable information generally includes limited information from a peace officer's confidential personnel records that is potentially relevant to the defense's case—either a proposed defense or the impeachment of an officer." (*People v. Nguyen* (2017) 12 Cal.App.5th 44, 47-48.) Judge de Bellefeuille failed to make the required record here.

We independently reviewed the first hearing on the *Pitchess* motion conducted by Judge de Bellefeuille, as well as the second hearing conducted by Judge Robison pursuant to our order. As to the latter, we agree with Judge Robison that trial counsel's declaration established the good cause necessary for an in camera review of the officer's personnel records. Counsel alleged a witness to the incident saw Palomino running from the police and did not see him carrying a gun. He further alleged the defense was that Palomino was unarmed at the time he was shot by Smith in the back three times. He further alleged Smith was the only one of approximately 12 officers involved who claims to have seen Palomino with a gun, and Smith's allegation that Palomino was armed with a firearm was false. Additionally, counsel asserted a witness to the charged carjacking, kidnapping in the course of a carjacking, and assault with a semiautomatic firearm, each of which purportedly occurred just moments prior to Palomino jumping out of the vehicle, stated Palomino did have a gun inside the vehicle. Thus, the prior complaints about the investigator planting evidence and submitting false police reports were material to Palomino's defense and should have been disclosed to the defense. Judge de Bellefeuille's failure to order disclosure of these complaints was error.

17

Even so, in order to obtain a reversal, Palomino "must also demonstrate a reasonable probability of a different outcome had the evidence been disclosed. [Citations.]" (*People v. Gaines* (2009) 46 Cal.4th 172, 182-183.) But that showing is impossible here because he has no knowledge of the information he was denied.

In these situations, where *Pitchess* material was erroneously withheld, it is appropriate for the appellate court to conditionally reverse the conviction for further proceedings. On remand, the defendant is provided the *Pitchess* material erroneously withheld and given an appropriate period of time to investigate that information. Thereafter he must demonstrate the prejudicial effect of the trial court's error. If the defendant carries his burden and demonstrates he likely would have received a different result in the prior trial had he been given the *Pitchess* material, the trial court grants the defendant's motion for a new trial. If the defendant fails to carry his burden, the trial court reinstates the judgment. (See *People v. Wycoff* (2008) 164 Cal.App.4th 410, 416.)

We cannot determine on this record whether Palomino was prejudiced by Judge de Bellefeuille's failure to disclose the *Pitchess* material after the first in camera hearing. The Attorney General argues the appropriate remedy is to conditionally reverse only count 8 (assault with a semiautomatic firearm on a police officer).

The Attorney General's argument is based on *People v. Fernandez* (2012) 208 Cal.App.4th 100, 104, where the defendant was convicted of robbery and willfully inflicting corporal injury on a spouse, cohabitant, or child's parent. On appeal, he contended the trial court abused its discretion in denying his *Pitchess* motion. (*Id.* at pp. 104-105.) Finding the trial court had abused its discretion, the appellate court conditionally reversed one of the two counts; the one to which the police officer whose personnel records were sought to be discovered testified. (*Id.* at pp. 105, 123.)

As to count 8 in this case, Smith testified he observed H.M.'s car stopping, Palomino jumping out, and the subsequent chase, including the officer's shooting of Palomino when, according to Smith, Palomino stopped and raised a firearm pointing it at

18

Smith.  The *Pitchess* information Palomino was denied involved allegations that Smith planted evidence in the past and filed false police reports.  Palomino is entitled to take this new information and demonstrate to the trial court, if he can, that the evidence derived from this information "demonstrate a reasonable probability of a different outcome had the [information] been disclosed.  [Citations.]"  (*People v. Gaines, supra*, 46 Cal.4th at pp. 182-183.)  Accordingly, we will conditionally reverse Palomino's conviction on count 8 (assault with a semiautomatic firearm), as well as the enhancements found true in connection with that count.  (See *People v. Huynh* (1987) 194 Cal.App.3d 634, 640, fn 6 [enhancement has no life independent of count to which it attaches].)

That does not, however, end the analysis.  Counts 1 through 4 concerned events that occurred in the late afternoon/early evening of August 23, 2016.  Smith did not testify in connection with any of those counts.  His testimony about events that occurred hours later could not have affected the verdicts on those charges.  Thus, as to those charges, the *Pitchess* error was harmless, regardless of what information is uncovered as a result of the material now to be disclosed to Palomino.

Although Smith's testimony about Palomino's pointing a semiautomatic gun at him could not have affected the jury's verdicts on counts 1 through 4, the prosecutor used Smith's testimony in forming the hypothetical questions posed to the gang expert.  Based on those hypothetical questions, the gang expert opined all the offenses to which the gang enhancements were attached had been committed for the benefit of a criminal street gang and that Palomino was an active gang participant.  Smith's contribution to the hypothetical facts cannot be parsed.  The gang expert reached his conclusions "based on the totality of all those crimes."  Therefore, the conviction on count 9 (active participation in a criminal street gang) and all the gang enhancements that were found true as to the other counts must also be conditionally reversed.

19

So too, must we conditionally reverse the convictions on counts 5 (kidnapping in course of carjacking) and 7 (assault with a semiautomatic firearm on H.M.). The commission of these offenses occurred simultaneously. As noted, Palomino was the right front passenger in H.M.'s vehicle that evening. When the police followed the vehicle, he told H.M. to get as close to as possible to Neighbors. When asked if Palomino pulled out a gun during the incident, H.M. stated Palomino took out something, but he did not know what it was. Smith's testimony that Palomino had a gun after he jumped out of the vehicle and ran, supported the jury's verdict that Palomino assaulted H.M. with the semiautomatic firearm while attempting to get H.M. to flee from the police and drive him (Palomino) as close to the gang's territory as possible. Consequently, if Palomino is able to use the *Pitchess* material to discover evidence that would impeach Smith's testimony that he had a gun, that evidence could have made a difference in the verdicts on counts 5 and 7 and the firearm enhancements attached to each.

## DISPOSITION

The conviction for assault as a lesser included offense of count 1, and the convictions on counts 3 and 4 are affirmed. The convictions on the remaining counts (5, 7, 8 & 9), the true findings on the gang enhancements, and true findings on the firearm enhancements are conditionally reversed and the matter is remanded for further proceedings.

On remand, Palomino is entitled to the *Pitchess* material Judge Robison found should have been disclosed to him. The trial court shall grant Palomino sufficient time to investigate the disclosed information and thereafter file a motion for a new trial. If Palomino fails to file a motion for a new trial or if the court denies the motion, the court shall reinstate the conditionally reversed convictions and true findings.


THOMPSON, J.

WE CONCUR:


MOORE, ACTING P. J.


GOETHALS, J.

21